## 17512

STATE, Respondent, v. Raymond E. SANDERS, Appellant

(107 S. E. (2d) 457)

*Messrs. Robert B. Nance* and *Sapp, Jordan & Sapp,* of Columbia, *for Appellant,*

*Messrs. T. P. Taylor, Solicitor,* and *John W. Foard, Jr., Assistant Solicitor,* of Columbia, *for Respondent,*

*Messrs. Robert B. Nance* and *Sapp, Jordan & Sapp,* of Columbia, *for Appellant, in reply,*

March 9, 1959.

LEGGE, Justice.

Collision on a highway in Richland County between two automobiles, one driven by Mr. B. J. Eargle and the other by appellant, resulted in Eargle's death and appellant's conviction of reckless homicide. His appeal raises a single question: Did the trial judge err in permitting the state to introduce in evidence the result of a chemical analysis of a specimen of appellant's blood taken shortly after the accident?

Counsel for appellant argue that the taking of his blood, without his consent, to be analyzed for alcohol content, so that the result of such analysis might be used in evidence against him, violated his immunity from self-incrimination under the Fifth Amendment of the Constitution of the United States and Article I, Section 17, of the Constitution of this state; and, further, that such sampling of his blood was an invasion of his body repugnant to the concept of due process under the Fourteenth Amendment.

The question thus sought to be raised is an interesting one, not heretofore presented to this court, and as to which the cases in other jurisdictions are not in agreement. See *Breithaupt v. Abram,* 352 U. S. 432, 77 S. Ct. 408, 1 L. Ed. (2d) 448, and annotations in 164 A. L. R. 967 and 25 A. L. R. (2d) 1407. But we shall not now undertake to answer it, for the premise of nonacquiescence is without factual support in the record before us.

State Highway Patrolman E. P. Ayres, a witness for the prosecution, testified on direct examination as follows:

"Q. Well, Mr. Ayres, did you go anywhere from the scene, after you 'had made this investigation we are talking about? A. After we got the roadway clear, I immediately

went on down to the hospital, the Columbia Hospital, to the white emergency room, where I found Mr. Eargle being treated by the surgeons and nurses. He was being taken care of there, but he was in no condition to talk.

Q. You didn't talk to Mr. Eargle? A. No, sir.

Q. Did you see the defendant, Sanders, there? A. Yes, sir, he was in the other emergency room adjoining the one that Mr. Eargle was in. He was still on the stretcher, which was on the floor, but he was either passed out or asleep, one of the two.

Q. Did you go up close to him? A. Yes, sir, I got down on my hands and knees to smell his breath, and I smelled the odor of alcohol very strongly on him.

Q. You smelled it on his breath? A. Yes, sir, that's correct.

Q. Did you ever get to talk to him, Sanders? A. Yes, sir, I tried to talk to him at the emergency room at the Columbia Hospital, but he wouldn't talk to me. He was conscious after a while there, and he just didn't have anything to say.

Q. Did you ask him anything? A. I asked him what happened, and he was reluctant to say, and I asked him about taking a blood test, which he didn't say anything about, but held out his arm to the nurse to take the blood with the needle.

Q. Well, did you see the nurse take some blood from his arm at that time? A. I did, sir.

Q. What did you do with that blood that she took? A. After she took the blood, she put it in a vial and corked it up, and I immediately taken it out to SLED Headquarters— that's the South Carolina Law Enforcement Division—and turned it over to Mr. Jim Wilson for analysis.

Q. He is the chemist out there? A. That's right, sir."

And on cross-examination:

"Mr. Nance: All right, now, Mr. Ayres, tell us now about asking Mr. Sanders about taking some blood. Tell us about that. The Witness: I asked Mr. Sanders, while he was on

the emergency room table—he had been taken off the stretcher and put on the emergency room table, and his wife was standing beside him at the time—I asked Mr. Sanders if he would submit to a blood test, and he made no reply, and he held out his arm for the needle, and the girl took the blood from him then. .

Q. You didn't talk to the girl? A. No, sir.

Q. You don't know whether he was conscious or unconscious at that time, do you? A. He had his eyes open, and he was talking to his wife.

Q. He had his eyes open, but you don't know whether he was conscious or unconscious, do you? A. He had talked to his wife previous to that, sir, so I imagine he was conscious."

And on re-direct:

"Q. Mr. Ayres, about what time would you estimate the blood was taken from him? A. Approximately forty-five minutes after I arrived at the hospital.

Q. And you arrived there about what time? A. About 8:45.

Q. Did you take it straight on to SLED? A. Yes, sir, I did.

Q. And turned it immediately over to Mr. Wilson? A. Yes, sir."

Mr. James K. Wilson, laboratory technician of South Carolina Law Enforcement Division, testified that his analysis of the sample of appellant's blood turned over to him by Mr. Ayres showed alcohol content of .24 per cent.

The foregoing is all of the evidence in the record bearing upon the issue sought to be raised here. It is uncontradicted and unimpeached, and in our opinion does not warrant inference that appellant's blood sample was taken without his consent.

Affirmed.

STUKES, C. J., and TAYLOR, OXNER and Moss, JJ., concur.