UNITED STATES, Appellee,

v.

Ralph M. ARMSTRONG, Specialist Five,
U. S. Army, Appellant.

No. 37,041.
SPCM 13493.

U. S. Court of Military Appeals.

Oct. 27, 1980.

For Appellant: *Captain Hollis C. Lewis Jr.* (argued); *Captain James F. Nagle* (reargued); *Colonel Edward S. Adamkewicz, Jr., Lieutenant Colonel John F. Lymburner, Major D. David Hostler, Major Charles A. Byler, Captain James J. Parwulski,* (on briefs).

For Appellee: *Captain Michael C. Chapman* (argued and reargued); *Colonel Thomas H. Davis, Colonel R. R. Boller, Major Michael B. Kennett, Captain Carl F. Meyer, Jr.* (on brief); *Major Ted B. Borek, Captain Brian X. Bush.*

*Opinion*

EVERETT, Chief Judge:

On his plea of not guilty appellant was tried by special court–martial, consisting of military judge alone, on charges of involuntary manslaughter, reckless driving resulting in injury, fleeing the scene of a collision and possession of marihuana. The first and second charges were alleged as violations of Articles 119 and 111, Uniform Code of Military Justice, 10 U.S.C. §§ 919 and 911, respectively; the other two, as violations of Article 134, 10 U.S.C. § 934. Appellant was acquitted of fleeing the scene of the collision, but he was found guilty of the remaining charges. The military judge then sentenced him to a bad–conduct discharge, forfeiture of $250 pay per month for 6 months, and reduction to the lowest enlisted grade. The convening authority approved the sentence, and, in turn, the United States Army Court of Military Review affirmed the findings and sentence without opinion. On April 6, 1979, the Court granted appellant's petition for review in order to consider two issues. 7 M.J. 41.

The first issue concerns the admissibility in evidence of a blood specimen extracted from the appellant at a military hospital soon after the automobile accident which gave rise to the charge of involuntary manslaughter. The second involves reception in evidence of a pipe and two packets—one containing marihuana and the other containing marihuana in the hashish form—that were found in the appellant's jacket. The jacket was removed from the appellant's car after the car had been impounded by the German police following the fatal accident.

I

On the evening of January 29, 1978, appellant drove with three passengers in his Mercedes automobile to a night club in Bremerhaven, Germany. While there they consumed a substantial amount of beer. After they had departed the night club, appellant's automobile crashed into the rear of a trailer–container parked on a city street. The passenger seated beside the appellant on the front seat was killed; the other passengers were injured to various degrees.

Appellant ran from the scene of the accident and was apprehended in flight by the German police. Shortly thereafter, he was confronted by Sergeant Luis of the American military police who detected a strong odor of alcohol on appellant's breath. Luis accompanied the appellant to an American hospital and informed him that he was suspected of driving under the influence of alcohol; that he had a right to remain silent; and that he had a right to refuse to take a blood–alcohol test at the American hospital. However, the appellant was advised that "if you refuse to take the blood alcohol test, your USAREUR permit would be revoked." Moreover, Luis explained to appellant that the German police could transport him to a German medical facility where a blood specimen could be drawn from him by force and, if necessary, used in any subsequent German court proceedings. Thereupon, appellant agreed to take the blood alcohol test.

■ Because of the need to treat other persons injured in the crash, a delay of some three hours occurred before the blood was drawn. Just before the appellant took the blood test, he was re–advised of his rights and once again agreed to submit to the test. Two blood specimens were taken— one for use by American military authorities[1] and the other for the German police.

---

1. As reported by the laboratory technician who testified, the test revealed that a 1.1 milligram per deciliter concentration of alcohol existed in appellant's blood. While no expert testimony was offered to interpret the significance of this result, it can be judicially noted that 100 milligrams per deciliter is equivalent to 1.0 milligrams per milliliter, which has been used in legislation establishing presumptions of intoxi-

cation on the basis of blood alcohol concentration. Thus, the percentage of concentration of alcohol in the blood which was reflected in the results as purportedly testified to by the witness was infinitesimal. However, this testimony obviously was the result of a slip of the tongue of the witness. Her reference to 1.1 milligrams would only fit in the context of the trial events if used in relationship to a milliliter,

At trial, defense counsel objected to the receipt in evidence of the blood–test results. After considering the evidence and hearing extensive argument, the military judge concluded that the test results were not within the protection of Article 31, UCMJ, 10 U.S.C. § 831, and should be admitted. This ruling gives rise to the first issue we shall consider.[2]

After the accident appellant's Mercedes was transported by the German fire brigade to a lot in Bremerhaven which they regularly used to impound vehicles. According to stipulated testimony, no inventory was conducted at the time of the impoundment, as would have been customary if the Germans had planned to take any inventory. Early on the morning of January 21–only a few hours after the accident–two American military policemen looked at the outside of the car, took some pictures, and then left. Approximately two hours later, other military police arrived, whereupon the German custodian of the impoundment lot began looking into the contents of the car. The military police were present at the search, in which the marihuana and pipe were found. These items were turned over to the military police and subsequently were the subject of testimony at the trial. The legality of the search and seizure of the contraband was contested by defense counsel at trial. The military judge's receipt of evidence concerning the marihuana and pipe gave rise to the second issue.

## II

Early in its history the Court held invalid the provision in paragraph 150*b* of the 1951 Manual for Courts–Martial which authorized "requiring a person (including an accused) . . . to make a sample of his handwriting" or "to utter words for the purpose of voice identification." *United States v. Greer*, 3 U.S.C.M.A. 576, 13 C.M.R. 132 (1953); *United States v. Rosato*, 3 U.S. C.M.A. 143, 11 C.M.R. 143 (1953). Such a requirement was deemed to conflict with the prohibition against self–incrimination contained in Article 31(a), UCMJ, 10 U.S.C. § 831(a).

Later the Court drew a distinction between handwriting and voice samples–production of which required active participation of the suspect–and urine specimens–which could be produced without such participation. *United States v. Booker*, 4 U.S. C.M.A. 335, 15 C.M.R. 335 (1954); *United States v. Williamson*, 4 U.S.C.M.A. 320, 15 C.M.R. 320 (1954). Under this view apparently blood specimens and other body fluids fell within the same category as urine specimens. Furthermore, even for handwriting and voice samples, the Court concluded that an Article 31(b) warning was not required, since they were not "statements" or the products of "interrogation." *See, e. g., United States v. McGriff*, 6 U.S.C.M.A. 143, 19 C.M.R. 269 (1955); *United States v. Ball*,

---

but it would make no sense if used in relationship to a deciliter. The equivalent reference for a deciliter would be 110 milligrams. Although not introduced in evidence and so not subject to consideration for present purposes, the test results, according to government counsel, were 1.1 milligrams per milliliter. Doubtless, if the parties had not recognized what the witness meant, defense counsel would have relied on the test results in pressing for a finding of not guilty, since those results as literally recited by the technician would have disproved any possibility of intoxication. Instead, defense counsel waged a strenuous campaign to prevent the admission of the test results and thereby displayed her recognition that the results of the blood test would damage her client's cause. Since it is readily apparent that the witness meant to say 1.1 milligrams per milliliter– which is a significant concentration–we are jus-

tified in reviewing here the admissibility of the test results.

We in no way retreat from the rule established in *United States v. Bethea*, 22 U.S.C. M.A. 223, 46 C.M.R. 223 (1973), for here only matters before the factfinder are considered along with the reasonable inferences therefrom. Our function is not performed in a vacuum. It is obvious from the entire record that while the testimony involved a misstatement the parties all understood the witness' meaning. Under such circumstances we are also entitled to rely on the witness' true meaning for review purposes so long as evidence outside the record is not our basis for doing so.

2. However, apart from the results of the blood alcohol test, there was ample evidence to establish the appellant's intoxication and his culpable negligence at the time of the fatal accident.

6 U.S.C.M.A. 100, 104, 19 C.M.R. 226, 230 (1955).

Thereafter the Court reversed itself holding that warnings were required for handwriting exemplars. *See United States v. Minnifield*, 9 U.S.C.M.A. 373, 26 C.M.R. 153 (1958). And the Court's treatment of body fluids suggested that not only was it impermissible to order a serviceperson to submit to their extraction, but also a warning might be required before requesting that they be submitted. *Cf. United States v. Musguire*, 9 U.S.C.M.A. 67, 25 C.M.R. 329 (1958) (blood specimen); *United States v. Ruiz*, 23 U.S.C.M.A. 181, 48 C.M.R. 797 (1974) (urine specimen).[3]

Meanwhile, the Supreme Court took a very different view in applying the protections of the Bill of Rights to the securing by law enforcement officials of body fluids, handwriting samples, and voice exemplars from suspects. In *Breithaupt v. Abram*, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957), which was decided before the Supreme Court had begun to incorporate into Fourteenth Amendment "due process" the safeguards of the Fourth and Fifth Amendments, it was held that the extraction of a blood specimen from an unconscious defendant by a doctor in a hospital emergency room did not constitute the shocking conduct that would run afoul of "due process", as then conceived. In this regard, drawing of blood differed from the stomach pumping condemned in *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

Later, after *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), gave impetus to the process of incorporating various provisions of the Bill of Rights into the Fourteenth Amendment, the Court considered whether extraction of a blood specimen infringed on the privilege against self-incrimination or constituted an unreasonable search and seizure. In *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), both questions were answered in the negative. In that case a blood specimen had been taken from a driver who had been arrested for drunk driving but who had refused to submit voluntarily to the blood test.

That the Supreme Court had adopted Wigmore's theory of "testimonial compulsion" in interpreting the privilege against self-incrimination became evident in cases like *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (voice exemplars); *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (handwriting exemplars); *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (grand jury subpoenas for voice exemplars), and *United States v. Mara*, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973) (grand jury subpoenas for handwriting exemplars). Under this view, words or conduct which lack testimonial characteristics are not protected by the Fifth Amendment. *Cf. Holt v. United States*, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); 8 Wigmore, *Evidence* § 2263 (McNaughton rev. 1961).

This Court has rejected efforts to utilize the same theory of "testimonial compulsion" as an aid in interpreting the intent of Congress regarding Article 31 of the Uniform Code of Military Justice. Now, in the face not only of the Supreme Court's opinions but also of a mounting tide of state court precedents, the question requires a new look.[4]

---

**3.** *Ruiz* was recently relied on by the United States Court of Appeals for the District of Columbia in holding invalid administrative discharges predicated on the results of compulsory urinalysis. *Giles v. Secretary of the Army*, 627 F.2d 554 (D.C.Cir. 1980).

**4.** *See State v. Blair*, 45 N.J. 43, 211 A.2d 196 (1965); *State v. Riley*, 24 Conn.Sup. 235, 189 A.2d 518 (1962); *State v. Sanders*, 234 S.C. 233, 107 S.E.2d 457 (1959); *State v. Kroening*, 274 Wis. 266, 79 N.W.2d 810 (1956); *Rivers v. Black*, 259 Ala. 528, 68 So.2d 2 (1953); *People*

*v. Tucker*, 88 Cal.App.2d 333, 198 P.2d 941 (1948); *State v. Cram*, 176 Or. 577, 160 P.2d 283 (1945). *See also* Mil.R.Evid. 312(d), which provides:

> *Seizure of bodily fluids.* Nonconsensual extraction of bodily fluids, including blood and urine, may be made from the body of an individual pursuant to a search warrant or a search authorization under rule 315. Nonconsensual extraction of bodily fluids may be made without such warrant or authorization, notwithstanding rule 315(g), only when there

Recently we refused to find that a right to counsel existed with respect to handwriting exemplars which a Secret Service agent obtained from a serviceperson who was in confinement at the time. *United States v. McDonald*, 9 M.J. 81 (C.M.A. 1980). We could not conceive that the right to counsel during custodial interrogation that was made available by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and by its military twin, *United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967), was intended to apply where only words or conduct lacking testimonial characteristics were being sought by law enforcement agents.

Similarly, when we examine the wording of Article 31(b), we doubt that the Congress intended to impose a warning requirement on law enforcement agents who seek to obtain a suspect's permission to extract a blood specimen. The words "interrogate" and "statement" in Article 31(b) do not suggest that Congress meant to require that a warning be given before the investigator obtained from a suspect evidence which would not constitute a communication by that suspect. Indeed, if body fluids,[5] handwriting exemplars, and the like were intended to be covered by Article 31(b), Congress would probably have stated its warning requirement in language like that of Article 31(c), which directs that under some circumstances an accused shall not be compelled "to make a statement or produce evidence." .

The purpose of Article 31(b) apparently is to provide servicepersons with a protection which, at the time of the Uniform Code's enactment, was almost unknown in American courts, but which was deemed necessary because of subtle pressures which existed in military society. *See* Index and Legislative History, Uniform Code of Military Justice, Hearings Before a Subcommittee of the Committee on Armed Services, House of Representatives, 81st Cong., 1st Sess., H.R. 2498, pp. 984–85 (1949). Conditioned to obey, a serviceperson asked for a statement about an offense may feel himself to be under a special obligation to make such a statement. Moreover, he may be especially amenable to saying what he thinks his military superior wants him to say – whether it is true or not. Thus, the serviceperson needs the reminder required under Article 31 to the effect that he need not be a witness against himself. *See id.* at 990. To paraphrase a remark by Mr. Justice Steward in *Rhode Island v. Innis*, —— U.S. ——, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297 (1980), "[t]he concern of the [Congress] in [enacting Article 31(b)] was that the 'interrogation environment' created by the interplay of interrogation and [military relationships] would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory incrimination" contained in Article 31(a) of the Uniform Code of Military Justice.

It is doubtful, however, that Congress intended to shield servicepersons from providing evidence – such as handwriting or voice exemplars – which their civilian counterparts could be ordered to provide under grand jury subpoena. *See United States v. Mara, supra; United States v. Dionisio, supra.* Moreover, nontestimonial evidence – such as handwriting exemplars or body fluids – obtained from a serviceperson does

---

is a clear indication that evidence of crime will be found and that there is reason to believe that the delay that would result if a warrant or authorization were sought could result in the destruction of the evidence. Involuntary extraction of bodily fluids under this rule must be done in a reasonable fashion by a person with appropriate medical qualifications.

5. Although Mil.R.Evid. 312(d) uses the term "bodily fluids," we choose to employ the words "body fluids," which Webster's Third New International Dictionary (unabridged), recognizes as a noun (p. 246) and states is the proper form in connection with the word fluid: "(body s)" at p. 877. And it is significant that the Supreme Court used the term "body function" in *Schmerber v. California*, 384 U.S. 757, 764, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908 (1966). We note that the unabridged dictionary does not include the term "bodily fluids." This dictionary does, however, recognize "bodily form," "bodily comfort," "bodily fear," and "bodily illness". (P. 245). It also recognizes "body cavity," "body cell," "body heat," and "body odor." (P. 246.)

not pose the threat of unreliability, as does an involuntary statement. The reliability of evidence is not the sole criterion for determining whether its procurement violates constitutional guarantees, *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961), but the circumstance that application of Article 31(b) to body fluids would tend to restrict receipt of reliable evidence helps convince us – as it did the original members of this Court – that Congress never intended for a warning requirement to apply to requests that a suspect submit to a blood test.

### III

Even if use of appellant's blood specimen is not precluded by Article 31(b), is it barred by Article 31(a), which provides that no one subject to the Code "may compel any person to incriminate himself"? It will be recalled that Sergeant Luis, a military policeman, advised appellant that, if he refused to submit to a blood–alcohol test, he would lose his USAREUR driving permit and would be subject to extraction of blood by the German police, who had taken him into custody after the accident.[6] Under the circumstances of this case this warning from Sergeant Luis – at least to the extent that it threatened a revocation of appellant's own driving permit – might be construed as compulsion for purposes of Article 31(a). *Cf. Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967); *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). Of course, *California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), upheld requirements that an accident be reported despite the argument that the reporting requirement compelled possible self–incrimination. However, in *Byers* the reporting might be construed as much more directly related to the State's regulatory functions than to prosecution for criminal offenses; in the case at hand the obtaining of the blood specimen from appellant was closely intertwined with

**6.** Apparently this advice accords fully with USAREUR Regulation 40–160, dated 26 November 1968, which was then in effect. Among the applicable provisions are these:

3. *Legal Aspects.* a. . . . If law enforcement authorities of the Federal Republic of Germany have requested an individual to submit to a blood–alcohol test and he refuses to submit to such a test, he will be advised of the provisions of paragraph 4 or 5 of this regulation, as applicable.

b. Under section II, USAREUR Regulation 190–2, effective 1 January 1969, consent to submit to a blood–alcohol test is a condition placed on the privilege of retaining a USAREUR privately owned vehicle (POV) operator's license. The tests may, under prescribed conditions, be requested by U.S. military police, Air Force security police, or Navy shore patrol. When a test is requested under the cited regulation, the licensee should be advised as outlined in a above and additionally informed that, while he may legally refuse to submit to the blood–alcohol test, a refusal may result in the revocation of his USAREUR POV operator's license. If the licensee agrees to the taking of a blood sample, a signed statement of consent (Standard Form 522AE (Authorization for Administration of Anesthesia and Performance of Operations and Other Procedures)) will be obtained before the sample is drawn. The blood sample will be drawn and processed in accordance with paragraph 2b.

* * * * * *

4. *Blood Testing of US Personnel in Germany.*

a. Under German law, appropriate German authorities can forcibly require an individual who is involved in an incident and appears to be under the influence of alcohol to give a sample of his blood to a German physician when considered necessary to further a German criminal investigation unless the individual's health would be endangered by the test. Members of the US Forces, civilian employees, and dependents are subject to this law.

b. Examining medical officials will inform personnel who refuse to permit the withdrawal of blood for a blood–alcohol test that if they persist in their refusal, German authorities may forcibly withdraw blood for a blood–alcohol test and the cost of the test may be assessed against the individual by the German court if he is tried and convicted. The above provisions for revocation in the event of refusal to submit to a blood test are similar to provisions for revocation of a license in some states. *See, e. g., Kansas v. Garner*, 3 Kan.App.2d 697, 600 P.2d 1166 (1979), Review granted Dec. 6, 1979; *Griesheiner v. Curry*, 325 N.E.2d 263 (Ohio App. 1975); *Herr v. Department of Motor Vehicles*, 252 Or. 455, 450 P.2d 533 (1969).

the prospect that he would be prosecuted for homicide.

Whether the words of Sergeant Luis would constitute compulsion for purposes of Article 31(a) need not be determined, for the statutory language providing that no person may be compelled to "incriminate himself" was not intended to go beyond the scope of the Fifth Amendment. Hence it has no relevancy to blood specimens or other body fluids since, under the currently dominant "testimonial compulsion" approach to interpretation of the Fifth Amendment, such evidence is not subject to self–incrimination safeguards as it lacks the qualities of a communication by the suspect.

At the time of the Uniform Code's adoption – and for some years thereafter [7] – it was unclear which constitutional guarantees, if any, applied to servicepersons. Some of the provisions of the Code were intended to fill the void by providing a statutory basis for important procedural protections for which the constitutional foundation was still not firmly established. However, in some instances the statutory safeguard went beyond its constitutional counterpart. For example, the Code's safeguards against former jeopardy contained in Articles 44 and 63, UCMJ, 10 U.S.C. §§ 844 and 863, respectively, were greater than those then – or even now – available in federal or state courts.[8] Thus, it would not be anomalous if Congress extended to servicepersons a broader protection against self–incrimination than is granted by the Fifth Amendment. On the other hand, unlike the Code's clear language granting former jeopardy safeguards, nothing in the wording of Article 31(a) reveals any intent to extend a serviceperson's protection against self–incrimination to include types of evidence that would not fall within the Fifth Amendment's purview. Indeed, only two years after the enactment of the Code the Court recognized, "Undoubtedly, it was the intent of Congress in this division of the Article to secure to persons subject to the Code the same rights secured to those of the civilian community under the Fifth Amendment to the Constitution of the United States – no more and no less." *United States v. Eggers*, 3 U.S.C.M.A. 191, 195, 11 C.M.R. 191, 195 (1953).

There is clear legislative support for that view. During the initial hearings on the Code which were conducted by Subcommittee No. One of the House Committee on Armed Services, dispositive references were made concerning or explaining what was contemplated by the Article 31(a) provision. In attempting to clarify for Mr. Philbin, who asked "Why don't you use the language 'incriminate' there [in Article 31(c)] rather than 'degrade,'" Mr. Larkin explained:

Well, incriminate is a different concept than degrade. *We do use the language "incriminate" and provide the standard protection against incriminating statements.*

* * * * * *

Well, (b) covers incriminating, Mr. Philbin.

There are two other changes. In (a) we have provided, you will notice, that no person shall compel any person to incriminate himself or answer a question which might incriminate him. Heretofore, in the Articles of War and in last year's act, it was limited to witnesses.

7. For an expression of the conflicting views about the applicability of the Bill or Rights to service personnel, *see* Henderson, *Courts–Martial and the Constitution: The Original Understanding*, 71 Harv.L.Rev. 293 (1957); Wiener, *Courts–Martial and the Bill of Rights: The Original Practice*, 72 Harv.L.Rev. 1 (1958).

8. Adoption of the Code preceded *Green v. United States*, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957), which prohibited retrial on the original first degree murder indictment after de-fendant had successfully appealed from a conviction for second degree murder, and *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), which incorporated the protection against double jeopardy into Fourteenth Amendment due process. Even today the protection against an increased sentence in the event of a retrial is greater under Article 63 than under the Bill of Rights. *See North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

In addition we have provided, as you see, that a person must be first informed in effect that anything he says can be used against him. That is not a requirement normally found in civil courts—this provision of informing a man in advance.

Index and Legislative History, *supra* at 984 (emphasis added).

However, as a result of continued uncertainty and misgivings regarding subsection (c) of Article 31, Mr. Larkin further explained the different purposes behind the provisions under Article 31:

But we adopted this format because we put in here as I mentioned the additional necessity of informing the man before you take a statement that insofar as incrimination is concerned it might be used against him.

In (a) we have just reiterated again the right not to incriminate himself.

(b) incidentally, covers a wider scope in that you can't force a man to incriminate himself beforehand—not just on the trial, if you will. And this in addition, since it prohibits any person trying to force a person accused or one suspected, would make it a crime for any officer or any person who tries to force a person to do that.

*So not only do we retain the constitutional protections against* self–incrimination and this evidentiary protection against degrading yourself unless it is material, but it goes further and provides that if anybody tries to force you to incriminate yourself then he has committed an offense. In providing for all those ideas we have different language.

*Id.* at 988 (emphasis added).

At still another hearing before the subcommittee, Colonel Melvin Mass, the National President of the Marine Corps Reserve Association, even suggested that the explicit language—"by reason of his constitutional rights"—be added to the Article, "so that the accused would be advised that he

did not have to make any statement and the reason he did not have to is because of his constitutional rights not to have to make them." [9] *Id.* at 712. However, when the final report of the House Armed Services Committee on the Uniform Code was brought to the floor of the House of Representatives for debate, Mr. Philbin, in summarizing the bill, simply stated that the bill "seeks to shield the accused substantially just as he is shielded by our Constitution and laws in civil courts, in most substantial particulars." 95 Cong.Rec. 5726 (1949).

Thus, the House hearings establish that Congress envisioned the right against compulsory self–incrimination–encompassed in subsection (a) of Article 31–as being conterminous with the constitutional right.

When the proposed Uniform Code of Military Justice reached the Senate, the hearings were much briefer than in the House of Representatives. Even so, Senator Kefauver, who was an active participant in the hearings, commented that "Article 31 . . fully guarantees the privilege against self–incrimination and contains a provision requiring that an accused must be informed of this privilege before being interrogated." 96 Cong.Rec. 1361 (1950) We infer that Senator Kefauver and his colleagues in the Congress were so clear that the term "incriminate" in Article 31 was coextensive with the constitutional privilege against self–incrimination that they never took pains to exclude the possibility of any other interpretation.

The commentary to Article 31(a) in the Index and Legislative History of the Code again verifies that this subdivision merely "extends the privilege against self–incrimination to all persons under all circumstances," since under then current "Army and Navy provisions only persons who [were] witnesses [were] specifically granted the privilege." *See* Index and Legislative History, *supra*, House of Representatives, Report No. 491 to accompany H.R. 4080, p. 19.

---

**9.** Even though Colonel Mass referred to Article 30(b), he could only have meant Article 31 because Article 30 does not even pertain to an accused making a statement. Furthermore, he suggested that his amendment be inserted after the word "that," but such word is not even contained in Article 30(b).

Finally, we note from the Index and Legislative History of the Code that the "[r]eferences" listed under Article 31 are Article of War 24, 10 U.S.C. § 1495,[10] and Articles for the Government of the Navy, article 42(c).[11] Both of these references unmistakably refer only to an oral or written "statement" in extending the right against compulsory self–incrimination. Paragraph 127 of the Manual for Courts–Martial, U.S. Army, 1949, explains Article of War 24 in this way:

It is the duty of any person in obtaining a statement from an accused to advise him that he does not have to make any statement at all regarding the offense of which he is accused or being investigated, and that any statement by the accused may be used as evidence against him in a trial by court–martial. (A.W. 24).

A confession or admission may not be received in evidence if it was not voluntarily made. If the confession or admission was obtained from the accused in the course of an investigation, by informal interrogation or by any similar means, it may not be received in evidence unless it appears that the accused, through preliminary warning or otherwise, was aware of his right not to make any statement regarding an offense of which he was accused or concerning which he was being interrogated and understood that any statement made by him might be used as evidence against him in a trial by court–martial.

This language suggests that Article of War 24–which was a predecessor and "reference" for Article 31 of the Uniform Code of Military Justice–protected only verbal and written statements and perhaps their "functional equivalent."[12] See United States v. Howard, 5 U.S.C.M.A. 186, 190, 17 C.M.R. 186, 190 (1954).

Therefore, we conclude that, in enacting the compulsory self-incrimination provision of Article 31, Congress did not plan for

10. This Article provided:

*Compulsory Self–Incrimination Prohibited.–*No witness before a military court, commission, court of inquiry, or board, or before any officer conducting an investigation, or before any officer, military or civil, designated to take a deposition to be read in evidence before a military court, commission, court of inquiry, or board, or before an officer conducting an investigation, shall be compelled to incriminate himself or to answer any question the answer to which may tend to incriminate him or to answer any question not material to the issue or when such answer might tend to degrade him.

The use of coercion or unlawful influence in any manner whatsoever by any person to obtain any statement, admission or confession from any accused person or witness, shall be deemed to be conduct to the prejudice of good order and military discipline, and no such statement, admission, or confession shall be received in evidence by any court–martial. It shall be the duty of any person in obtaining any statement from an accused to advise him that he does not have to make any statement at all regarding the offense of which he is accused or being investigated, and that any statement by the accused may be used as evidence against him in a trial by court–martial.

11. The pertinent provision of this Article provided:

Any person duly subpoenaed to appear as a witness before a general court martial or court of inquiry of the Navy, who willfully neglects or refuses to appear, or refuses to qualify as a witness or to testify or produce documentary evidence, which such person may have been legally subpoenaed to produce, shall be deemed guilty of a misdemeanor, for which such person shall be punished on information in the district court of the United States; and it shall be the duty of the United States district attorney, on the certification of the facts to him by such naval court to file an information against and prosecute the person so offending, and the punishment of such person, on conviction, shall be a fine of not more than $500 or imprisonment not to exceed six months, or both, at the discretion of the court: Provided, That this shall not apply to persons residing beyond the State, Territory, or District in which such naval court is held, and that the fees of such witness and his mileage at the rates provided for witnesses in the United States district court for said State, Territory, or District shall be duly paid or tendered said witness, such amounts to be paid by the Bureau of Supplies and Accounts out of the appropriation for compensation of witnesses: Provided further, That no witness shall be compelled to incriminate himself or to answer any question which may tend to incriminate or degrade him.

12. This term is used in a different context in *Rhode Island v. Innis*, —— U.S. ——, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

blood samples to be covered by the privilege. Instead, the clearly manifested intent of Congress in enacting Article 31(a) was merely to afford to servicepersons a privilege against self-incrimination which paralleled the constitutional privilege. Accordingly, Article 31 did not apply to the taking of blood specimens from Armstrong since body fluids are not within the purview of the Fifth Amendment.

## IV

In addition to the problems under Article 31, receipt of the blood test evidence poses a question of unreasonable search and seizure. Paragraph 152 of the Manual for Courts–Martial, United States, 1969 (Revised Edition), provided at the time the blood sample was obtained from this appellant that a search was lawful if it was:

A search conducted as an incident of lawfully apprehending a person, which may include a search of his person, of the clothing he is wearing, and of property which, at the time of apprehension, is in his immediate possession or control, and a search of the place where the apprehension is made; but a search which involves an intrusion into his body, as by taking a sample of his blood for chemical analysis, may be conducted under this rule only when there is a clear indication that evidence of crime will be found, there is reason to believe that delay will threaten the destruction of the evidence, and the method of conducting the search is reasonable. See the example of an unreasonable method in the last paragraph of 150b.

See Mil.R.Evid. 312(d). Schmerber v. California, supra, also deals with the search and seizure issue in terms of apprehension and reason to believe that delay will threaten the destruction of the evidence.

It is not clear that either the Manual provision or Schmerber–from which that provision probably is derived–applies to the case at hand. In Schmerber, there was a

refusal to submit to a blood test, while here no such refusal took place. On the other hand, the "implied consent" regulations concerning blood–alcohol tests contemplate that such a test will be performed only when a suspect has been apprehended with probable cause for some offense related to drunken driving.[13]

In any event, any applicable requirements of paragraph 152 of the Manual and of the "implied consent" directives were met here. From the information then available to Sergeant Luis, the military policeman, he had every reason to believe that appellant had been driving while under the influence of alcohol and had committed some type of culpable homicide. The odor of alcohol indicated that evidence of crime would be found by a blood test. Moreover, alcohol in blood tends to dissipate over a relatively brief period of time, so that destruction of evidence was threatened. Indeed, for this reason many statutes dealing with blood tests prescribe relatively short times for administering the tests after a suspect has been apprehended. Thus, the extraction of the blood specimen involved here would seem justified by exigent circumstances in that disappearance of the evidence was imminent. Therefore, it would meet the requirements prescribed by the Manual and by Schmerber, to whatever extent those requirements apply here.

## V

██ Insofar as the search and seizure of the marihuana and pipe are concerned, we need not consider what rule should apply to searches by foreign law enforcement agents. Compare United States v. DeLeo, 5 U.S.C.M.A. 148, 17 C.M.R. 148 (1954), with United States v. Jordan, 1 M.J. 334 (C.M.A. 1976). Instead, the direct involvement of American military police calls for the application of the rules governing searches by American law enforcement personnel. United States v. Morrow, 537 F.2d 120, 139 (5th Cir. 1976); Stonehill v. United States,

---

**13.** Paragraph 2–1e, AR 190–5 (1 Aug. 73). It is unclear to what extent such regulations are controlling with respect to the admission of evidence obtained in violation of their provisions. See United States v. Caceres, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 642 (1979).

405 F.2d 738, 743 (9th Cir. 1968), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969); *Brulay v. United States*, 383 F.2d 345 (9th Cir. 1967), *cert. denied*, 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478 (1967). In the case at hand, the involvement of the military police went far beyond inducing or instigating a search of the appellant's car by the German police, who had impounded it. Here, the Americans were present for the search and aided in its performance by removing some of the contents of the jacket in which contraband was found, even though it is unclear from the testimony in the record whether the marihuana and pipe were located by the German custodian of the impoundment lot or by a military police investigator.

Can the search be considered a constitutionally permissible inventory incident to taking the vehicle into the custody of the German police? Stipulated testimony of the chief of the German police impound lot conflicts with this assumption, since he states that, if an inventory were performed, it would customarily occur when the vehicle arrived at the impoundment lot. Moreover, his testimony makes it clear that performance of an inventory by the Germans would have been unlikely under the circumstances of the case at bar.

If the accused's car had been on a city street in Germany and had been searched by American military police without authority from anyone, we would have been compelled to hold the search illegal. *See South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). We see no reason for a different result merely because the appellant's car had been damaged in an accident and towed to a German impoundment lot. Therefore, the fruits of the search should have been excluded.

1. Article 31(a), Uniform Code of Military Justice, 10 U.S.C. § 831(a).

2. Military Rules of Evidence, Manual for Courts–Martial, United States, 1969 (Revised edition), ch. XXVII.

## VI

The decision of the United States Army Court of Military Review is reversed as to specification 2 of Charge III and the sentence. The finding of guilty as to that specification is set aside, and the specification is dismissed. The record of trial is returned to the Judge Advocate General of the Army for referral to the Court of Military Review for reassessment of the sentence based on the remaining findings of guilty.

COOK, Judge, with whom FLETCHER, Judge, joins (concurring):

In *United States v. Ruiz*, 23 U.S.C.M.A. 181, 182, 48 C.M.R. 797, 798 (1974), the Court reviewed, and reaffirmed, earlier cases which held that Article 31(a) of the Uniform Code [1] "has a broader sweep than the Fifth Amendment" and protects an accused or suspect against being compelled to provide samples of his handwriting and being compelled to speak for voice identification. Nothing in this case requires that we reexamine this settled construction of Article 31. Consequently, we disassociate ourselves from the several statements in the principal opinion that imply a different construction of the article in regard to such evidence. However, we agree with the view expressed in the Analysis to Rule 301 of the new Military Rules of Evidence,[2] that "[n]o persuasive reason exists for Article 31 to be extended to bodily fluids," as a taking thereof, like the taking of fingerprints, does not involve the creation of evidence.[3] So far as it deals with the admissibility of the sample of blood taken from the accused, we agree with the principal opinion that it was not obtained in violation of Article 31. We also agree with parts V and VI.

3. Appendix 18, Analysis of the Military Rules of Evidence, Manual, *supra*.