**UNITED STATES, Appellee,**

v.

**Michael W. LLOYD, Private First Class, U.S. Army, Appellant.**

**Dkt. No. 39192/AR.**
**SPCM 14287/S.**

U. S. Court of Military Appeals.

Jan. 12, 1981.

For Appellant: *Captain Joseph A. Russelburg* (argued); *Lieutenant Colonel John F. Lymburner, Major Lawrence D. Galehouse* (on brief); *Colonel Edward S. Adamkewicz, Jr., Captain Allan T. Downen.*

For Appellee: *Captain Michael C. Chapman* (argued); *Colonel R. R. Boller, Major*

Ted B. Borek, Captain Paul G. Thompson (on brief); *Captain Charles A. Cosgrove.*

*Opinion of the Court*

EVERETT, Chief Judge:

On August 22, 1979, appellant was tried at Camp Casey, Korea, on four specifications alleging violations of a lawful general regulation. *See* Article 92, Uniform Code of Military Justice, 10 U.S.C. § 892. Contrary to his pleas, Lloyd was found guilty as charged, and sentenced to a bad–conduct discharge, confinement for 3 months, and reduction to Private E–1. The convening authority approved the sentence. On April 17, 1980, the United States Army Court of Military Review affirmed the findings and sentence. Thereafter, we granted review of the following issue:[1]

WHETHER APPELLANT'S CONFESSION TO RATION CONTROL VIOLATIONS AND TO LOSING HIS IDENTIFICATION CARD SHOULD HAVE BEEN EXCLUDED FROM EVIDENCE BECAUSE IT WAS TAINTED BY THE EARLIER ILLEGAL ACTIONS OF HIS COMPANY COMMANDER WHO, WITHOUT ADVISING APPELLANT OF HIS ARTICLE 31, UCMJ, RIGHTS, REQUIRED HIM TO SURRENDER HIS MILITARY IDENTIFICATION CARD FOR SIGNATURE COMPARISON WITH THE RATION CONTROL CARDS?

The Eighth Army Regulation on which the prosecution was based imposed controls on the purchase of certain merchandise in Korea. To prove the alleged violations of this directive the Government relied on evidence–chiefly documentary–which tended to show that, during the months of April and May 1979, appellant had purchased far more goods than he was authorized to buy. Part of this evidence consisted of a large number of controlled item purchase records reflecting various purchases during the

---

1. Literally construed, the granted issue involves a misstatement of fact, since the confession was that appellant had *not* lost his identification card.

time periods in question and apparently stamped with Lloyd's ration control plate. The intended inference was that, since the total of purchases attested by the cards bearing the stamp of appellant's ration control plate exceeded by far the amount that Lloyd could lawfully have purchased, he must have violated the applicable ration controls.

To rebut this inference, appellant offered in evidence Defense Exhibits A and B, which showed that early in April he had reported to military authorities the loss of his military identification (ID) card, ration control plate, driver's license, and meal card. Thus, the military judge was invited to find that the excessive purchases had been made by use of the ration control plate issued to Lloyd, but by someone entirely unrelated to him.[2]

The Government countered with the offer in evidence of a statement made by appellant to an Army Criminal Investigation Division (CID) agent prior to trial. There, Lloyd had confessed that even though on April 6 or 7 he had "reported that my Ration Control Plate (RCP) was lost along with my ID card, meal card, driver's license, and $30.00," none of these documents "were ever lost."

Trial defense counsel objected to the reception of this statement in evidence; and that objection raises the issue now before us. Although the pretrial statement was preceded by warnings, its admissibility is contested on the ground that the statement is the tainted fruit of an earlier transgression of Article 31, UCMJ, 10 U.S.C. § 831.

That claim is based on the unusual events that preceded the giving of the statement. They began when Captain Bertrand, appellant's company commander, received information early in June 1979, that Lloyd had made excessive purchases of merchandise subject to ration controls. Captain Bertrand took Lloyd with him to the office of Sergeant Johnson, a military police investigator, to investigate the overpurchases. At that time the commander suspected Lloyd of violating the ration control regulations. Bertrand knew that Lloyd had reported the loss of his ration control plate–production of which was apparently required in connection with making a purchase subject to ration control–and he was under the impression that the overpurchases had been made by appellant through the use of the new ration control plate, which had been issued to replace the one that had been reported lost. However, Bertrand discovered that the overpurchases had been made on the "old card," rather than the "new card." Of course, this indicated that the purchases had been made by someone who had come into possession of Lloyd's lost ration control plate. As Captain Bertrand testified, "I ruled out that it was his [Lloyd's] overpurchase."

Under the ration control procedures, it was apparently necessary that the person making a purchase not only present the ration control plate but also sign for the purchase. Presumably, if the signature was at odds with the identity shown on the ration control plate, the purchase could not be consummated. Therefore, when it appeared that someone had used Lloyd's ration control plate to make unauthorized purchases of rationed goods, it could be inferred that his name must have been forged in connection with these same purchases. In Captain Bertrand's words, "Someone had forged his signature using his card."

To test this hypothesis, which apparently was concurred in fully by Sergeant Johnson, appellant was asked to produce his identification card, so that Lloyd's signature on the identification card could be compared with the signatures used in connection with the purchases of ration controlled merchandise. "Sergeant Johnson, who was the MPI investigator, said that it looked like they were forgeries, because the signatures were all different."

---

2. These are keypunch cards, designated JK Form 281, which reflect a service member's purchase of controlled items, such as coffee, salad oil, chocolate, cans of beer, and cigarettes.

At this point, the investigation had branched out beyond ration control violations to include suspected multiple forgeries of appellant's name in connection with the purchases. Because of the broadened scope of the inquiry, Sergeant Johnson, Captain Bertrand, and appellant proceeded to the office of the Criminal Investigation Division (CID). There they explained the developments to Mr. Pageau, a CID investigator. Once again appellant was asked to produce his identification card so that the signature thereon could be compared by Mr. Pageau with the signatures that had accompanied the overpurchases of controlled merchandise in Lloyd's name. In connection with looking at the identification card, Mr. Pageau happened to refer back to the report filed by appellant which recited the loss of his ration control plate, driver's license, identification card, and meal ticket. Unfortunately for appellant, Pageau observed that the date of issuance on the identification card he was examining had preceded the date of the reported loss. This discrepancy induced a logical suspicion that, if Lloyd had not lost his ID card, as he had reported, he also probably had not lost his ration control plate. In that event Lloyd had made all the questioned purchases and had used the report of loss of his ration control plate as a subterfuge to divert suspicion.

Previously appellant had not received any Article 31(b) warning when he had been asked to produce his identification card at the military police office or subsequently at the CID office. Now, however, Mr. Pageau gave such a warning and informed appellant that he was not only suspected of ration control violations but also of having filed a false report about the loss of his various identification documents. Thereupon, appellant made the statement which, over defense objection, was later received in evidence for rebuttal purposes at this trial.[3]

The military judge invited the defense counsel to submit written requests for spe-cial findings. The requests were submitted two weeks after authentication of the record of trial, at which point they were summarily rejected as untimely. Thus, the basis for the judge's receipt in evidence of appellant's pretrial statement is not spelled out in the record. However, in affirming, the Court of Military Review ruled that, at the time when he was asked to produce his identification card, appellant was no longer a "suspect" within the meaning of Article 31(b) and so no obligation existed to provide him a warning.

Certainly investigators need not provide an Article 31(b) warning to a military person who has previously been suspected of an offense, but who is no longer a suspect. Indeed, how would the warnings be given to the person questioned as to the offense of which he is suspected when he is not suspected of any offense?

However, even if Lloyd had still been suspected of some offense when he was asked to produce his identification card, no warning would have been necessary. The request to see the identification card was for the purpose of comparing the signature on the card with other purported signatures of the appellant. The investigators were not attempting to establish that Lloyd possessed a false or unauthorized pass. Since the investigators wished to obtain the identification card only for use as a handwriting exemplar, the real issue posed is whether an Article 31(b) warning must precede a request that a suspect provide a handwriting exemplar.

Like blood specimens, *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), handwriting and voice exemplars are not protected by the privilege against self–incrimination. *United States v. Mara*, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973); *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (handwriting); *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *United Staes v. Wade*, 388 U.S.

---

**3.** Only the portion of the pretrial statement was received which related directly to the ration cards.

218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (voice). Under the rationale of our recent decision in *United States v. Armstrong,* 9 M.J. 374 (C.M.A.1980), there is no reason to require an Article 31(b) warning before requesting a suspect to give a handwriting sample or, as here, to produce a document containing his signature or handwriting to be used for comparison purposes.

Of course, investigators often examine the identification card of a service member for some reason other than to make a handwriting comparison. If their purpose is to determine the true identity of the person with whom they are dealing, then they are seeking a "statement." The production of the identification card under such circumstances implies a representation that the card reflects accurately the identity and identifying characteristics of the person who is responding to the request for production.[4]

However, such a "statement" as to identity is neutral and is not one "regarding" any offense within the meaning of Article 31(b). *Cf. United States v. Davenport,* 9 M.J. 364 (C.M.A.1980). Moreover, the obligation of a service member to produce his identification card in response to a reasonable request that he do so is analogous to a "independent duty to account." In such instances, no warning requirement exists. *United States v. Davenport, supra; United States v. Osborne,* 9 U.S.C.M.A. 455, 26 C.M.R. 235 (1958); *United States v. Aronson,* 8 U.S.C.M.A. 525, 25 C.M.R. 29 (1957).[5]

*United States v. Nowling,* 9 U.S.C.M.A. 100, 25 C.M.R. 362 (1958), is inapplicable to the case at bar. There the air policeman who asked to see the accused's pass already suspected that the pass had been taken away previously and that the accused was guilty of a pass violation. Compliance with the air policeman's request was equivalent to a "statement" by Nowling that the document he then produced was his own pass. Under the circumstances of that case, his "statement" was one "regarding" the very offense of which he was suspected; so the Court held that an Article 31(b) warning should have preceded the air policeman's request. The limited nature of the holding in *Nowling* is made clear by this language:

> We are not to be understood as holding that every routine or administrative check by an air policeman of a serviceman's pass or identification card must first be preceded by an Article 31 warning. However, when a reasonable suspicion exists, as in the instant case, that a pass violation is being committed, the suspect must be advised of his rights before an examination or surrender of his pass is requested.

*Id.* at 103, 25 C.M.R. at 365.

The ruling of the military judge in the case at hand is sustainable on several grounds. Therefore, the granted issue must be decided against appellant.

The decision of the United States Army Court of Military Review is affirmed.

Judge FLETCHER concurs.

COOK, Judge (concurring):

Disposition of this case does not require reexamination of the right of an accused under Article 31(b), Uniform Code of Military Justice, 10 U.S.C. § 831(b), to refuse a request to provide exemplars of his handwriting. *See* my opinion in *United States v. Armstrong,* 9 M.J. 374, 384 (C.M.A.1980). In other respects, I agree with the principal opinion and join in affirming the decision of the United States Army Court of Military Review.

---

4. In the case at bar, no "statement" of this sort was being solicited; Captain Bertrand, Sergeant Johnson, and Mr. Pageau all knew Lloyd's identity perfectly well.

5. Government appellate counsel assert that the Government has a property interest in any military identification and that without any Article 31(b) warning, a service member may be required to account for this "property" pursuant to a suitable request for its production. We need not rule on this argument, since the "duty to account" can be discerned here without resort to property concepts.