UNITED STATES

v.

Raphael EARLE, 129 50 2285, Private (E–1), U. S. Marine Corps.

NMCM 81 0695.

U. S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 26 June 1980.

Decided 15 Dec. 1981.

LT Thomas P. Murphy, JAGC, USNR, Appellate Defense Counsel.

LCDR John C. Vinson, JAGC, USN, Appellate Government Counsel.

Before GLADIS, Senior Judge, and BOHLEN and BYRNE, JJ.

BYRNE, Judge:

Private Earle was tried by a special court-martial at Camp Lejeune, North Carolina, on June 26, 1980. Contrary to his pleas, he was found guilty of three specifi-

cations of absence from his appointed place of duty, one specification of disrespect towards a commissioned officer, one specification of disobedience of an order of a commissioned officer, and three specifications of disobedience of orders of, and disrespect towards, noncommissioned officers, in violation of Articles 86, 89, 90, and 91, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 886, 889, 890, 891, respectively. In accordance with his pleas, he also was found guilty of one specification of unauthorized absence, in violation of Article 86, UCMJ. The military judge sentenced Private Earle to confinement at hard labor for 5 months, to forfeit $200.00 pay per month for 5 months, and to be discharged from the United States Marine Corps with a bad-conduct discharge. The convening authority approved the sentence, but the supervisory authority disapproved the guilty findings of one of three absences from appointed place of duty. Consequently, he reassessed the sentence by reducing the forfeitures to $175.00 per month for 5 months. Otherwise, he approved the sentence as adjudged.

■ The assignment of error raises one issue: whether Article 31, UCMJ, 10 U.S.C. § 831, must be complied with prior to ordering a suspect to produce his U.S. Armed Forces Identification Card. An analysis of Article 31 of the UCMJ, federal and military cases addressing similar circumstances, and the pressing necessities of military life demonstrates beyond cavil that the answer is "no."

Second Lieutenant Yecke, U. S. Marine Corps, suspected Private Earle of shouting disrespectful words concerning two commissioned officers at battalion headquarters. Lieutenant Yecke did not see the statements made, but he heard them and centered upon Private Earle as the most likely offender. Second Lieutenant Yecke ordered Private Earle to turn over his identification card in order to clarify *who* the individual was that he suspected of violating the UCMJ. This order was initially ignored by Private Earle, who stood up, put on his cover, and "headed out the front door of the battalion headquarters." Second

Lieutenant Yecke ordered him to stop several times "in a very loud voice," but he continued to walk. (R. 31.) After Private Earle left the building, and Second Lieutenant Yecke had requested a police sergeant to stop him; he did halt, and pursuant to Second Lieutenant Yecke's order, reentered battalion headquarters. Another order by Lieutenant Yecke to provide the identification card was refused. After a fifth order, Private Earle turned the card over stating, "Here, you can have it," in a "real sarcastic, belligerent type of voice." (R. 32.) Private Earle was not, however, charged with the disrespect offenses Second Lieutenat Yecke was investigating. Rather, he was found guilty of violating the orders to hand over his identification card and to stop. Private Earle was also found guilty of disrespect towards Second Lieutenant Yecke for his disrespectful behavior before he finally surrendered his identification card.

At trial, the military judge rejected the defense contentions that Article 31 must be complied with under such circumstances and that a suspect has a right "not to give his ID card even when asked." (R. 37.) The trial defense counsel argued that because Second Lieutenant Yecke was unsure of the identity of the suspect, Private Earle, providing the identification card would be incriminating and in violation of Article 31. We find no error in the ruling of the military judge regarding the lawfulness of Lieutenant Yecke's actions.

A.

*Article 31(a), UCMJ*

Article 31(a), UCMJ, 10 U.S.C. § 831(a), provides:

No person subject to this chapter may compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him.

■ Certainly, the order given by Second Lieutenant Yecke to Private Earle to turn over his identification card was compulsion warranting *consideration* of the applicability of Article 31(a). *See United States v. Armstrong*, 9 M.J. 374, 379 (C.M.A.1980).

There was, however, no "incrimination" involved in asking a suspect to produce his U.S. Armed Forces Identification Card for purposes of identification. *See United States v. Camacho,* 506 F.2d 594 (9th Cir. 1974).

 The language of Article 31(a) is "not intended to go beyond the scope of the Fifth Amendment." *United States v. Armstrong, supra* at 380. Requesting identification does not require Fifth Amendment warnings. *California v. Byers,* 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971). Consequently, there was no violation of Article 31(a), UCMJ.

## B.

### *Article 31(b), UCMJ*

Article 31(b), UCMJ, 10 U.S.C. § 831(b), provides:

No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

 The order by Second Lieutenant Yecke for Private Earle to identify himself

by providing his identification card was a request for a "neutral" statement; it was not one regarding an "offense within the meaning of Article 31(b)." *United States v. Lloyd,* 10 M.J. 172, 175 (C.M.A.1981).

Moreover, the obligation of a service member to produce his identification card in response to a reasonable request that he do so is analogous to an "independent duty to account." *In such instances, no warning requirement exists. Id.* at 175. (Emphasis supplied).

As a general rule, presenting an identification card lacks the qualities of communication contemplated by Article 31(b). The card poses no reliability problem. Personal identification is not protected by either the Fifth Amendment or Article 31(b). *See United States v. Armstrong, supra* at 377–379; *United States v. Lloyd, supra* at 174–175; and *United States v. Camacho, supra* at 596. Further, presentation of the identification card was not a statement "regarding" the offense of which Private Earle was suspected. Article 31(b), UCMJ; *United States v. Davenport,* 9 M.J. 364, 369 (C.M.A. 1980). Consequently, there was no violation of Article 31(b).[1]

## C.

### *Military Necessity*

Assuming that the federal courts *had* construed the Fifth Amendment to require

---

**1.** This case is distinguished from *United States v. Nowling,* 9 U.S.C.M.A. 100, 25 C.M.R. 362 (1958), where an air policeman, who strongly suspected that Nowling did not have an authorized liberty pass, asked him for his pass without providing Article 31 advice. Nowling produced the liberty pass of another. In *United States v. Nowling, supra,* the production of another's pass was an incriminating statement in and of itself, unlike the present case. *United States v. Nowling, supra,* has been distinguished by *United States v. Lloyd,* 10 MJ 172 (C.M.A.1981); *United States v. Ballard,* 17 U.S.C.M.A. 96, 37 C.M.R. 360 (1967); and *United States v. Davison,* 29 C.M.R. 829 (A.C.M.R.1960); it is considered a "limited" holding. *United States v. Lloyd, supra* at 175; *United States v. Ballard, supra* at at 362–363.

Discussions of an "independent duty to account" and "testimonial characteristics," indicate the opinion may no longer have the viability it once possessed. *See United States v.*

*Lloyd, supra; United States v. Armstrong,* 9 M.J. 374, 379 (C.M.A.1980); and *United States v. Davenport,* 9 M.J. 364 (C.M.A.1980).

In 1960, a high-level Army committee stated that *United States v. Nowling, supra,* was one of those decisions which "have had an adverse effect upon good order and discipline." Committee on the Uniform Code of Military Justice, Good Order and Discipline in the Army, *Report to Honorable Wilber M. Brucker, Secretary of the Army,* 88 (1960) (*Powell Committee*). In fact, the Powell Committee proposed a change to the Uniform Code of Military Justice to "reverse" *United States v. Nowling. Powell Committee, supra* at 102–103.

To hold that military authorities must provide a suspect who they believe has a false pass with the opportunity to refuse to produce a pass by asserting Article 31 rights is an unnecessary result that continues to constitute a direct threat to security, morale, good order, and discipline in the armed forces.

advice of self-incrimination rights before a policeman requests a suspect to provide identification, our response to this issue would not vary.

 Constitutional protections apply to military members, "except those which are expressly or by necessary implication inapplicable." *United States v. Jacoby,* 11 U.S. C.M.A. 428, 430–431, 29 C.M.R. 244, 246–247 (1960); *Burns v. Wilson,* 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953); *Courtney v. Williams,* 1 M.J. 267 (C.M.A.1976). A constitutional requirement that a military service member be advised of self-incrimination rights before presenting identification would be inapplicable by necessary implication. *Cf., United States v. Camacho, supra.*

Second Lieutenant Yecke, in attempting to identify an offender, was certainly acting pursuant to his military responsibilities. Article 1101 of *U.S. Navy Regulations, 1973,* (Navy Regs.), states as follows:

> Every officer in the naval service shall . . . so far as his authority extends, *enforce* the laws, regulations and orders relating to the Department of the Navy. . . . In the absence of instructions he shall act in conformity with the policies and customs of the service *to protect the public interest.* (Emphasis supplied).

Article 1103 of Navy Regs. states that:

> All persons in the naval service . . . shall aid, to the utmost of their ability and to the extent of their authority, in maintaining *good order and discipline* as well as in other matters concerned with the efficiency of the command. (Emphasis supplied).

Article 1139 of Navy Regs. states that:

> Persons in the Department of the Navy shall report to proper authority offenses committed by persons in the Department of the Navy which come under this (sic) observation.

It is absolutely essential that the military be able to identify offenders whose words or actions directly and adversely impact upon high morale, good order, and discipline. Military organizations require a respect for the authority represented by those officers and senior enlisted men and women into whose custody the ultimate security of the nation has been placed.

We do not believe that either the Congress, the United States Supreme Court or the United States Court of Military Appeals would arrive at a contrary conclusion. In *Schlesinger v. Councilman,* 420 U.S. 738, 757, 95 S.Ct. 1300, 1312, 43 L.Ed.2d 591 (1975), the United States Supreme Court noted:

> To prepare for and perform its vital role, the military must insist upon a respect for duty and a discipline without counterpart in civilian life. The laws and traditions governing that discipline have a long history; but they are founded on unique military exigencies as powerful now as in the past.

We do not hold that military necessity by its very nature overrides constitutional guarantees applicable to service persons. *See Cooke v. Ellis,* 12 M.J. 17 (C.M.A.1981). (Summary disposition.) (Everett, C. J., dissenting.) Article 1101 of Navy Regs. does not warrant disregard of Article 31, but rather, requires its enforcement. We emphasize, however, that the U. S. Constitution will not necessarily be applied in military cases exactly as it is in civilian cases, because military society differs from civilian society. The rights of men and women in the armed forces must be conditioned to meet certain overriding demands of discipline and duty. *Burns v. Wilson,* 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953). *See also Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

The findings and sentence are correct in law and fact and no error materially prejudicial to the substantial rights of the accused was committed. Accordingly, the findings of guilty and sentence, as approved on review below, are affirmed.

Senior Judge GLADIS and Judge BOHLEN concur.