**UNITED STATES, Appellee,**

v.

**First Lieutenant Robert J. TUBBS, 501–78–8542, United States Army, Appellant.**

**ACMR 9002691.**

U.S. Army Court of Military Review.

29 Jan. 1992.

For Appellant: Barry P. Steinberg (argued), Lieutenant Colonel Russell S. Estey, JAGC, Captain Michael W. Meier, JAGC (on brief).

For Appellee: Captain Edith Meyers, JAGC (argued), Colonel Alfred F. Arquilla, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC, Major Thomas E. Booth, JAGC (on brief).

Before JOHNSON, WERNER and GRAVELLE, Appellate Military Judges.

## OPINION OF THE COURT

JOHNSON, Senior Judge:

The appellant was tried by a general court-martial consisting of officers. Pursuant to his pleas, he was found guilty of assault with a dangerous weapon and two specifications each of simple assault and conduct unbecoming an officer, in violation of Articles 128 and 133, Uniform Code of Military Justice, 10 U.S.C. §§ 928 and 933

(1982), respectively [hereinafter UCMJ].[1] He was sentenced to dismissal, confinement for five years, and forfeiture of all pay and allowances. Pursuant to a pretrial agreement, the convening authority reduced the confinement to twelve months but otherwise approved the adjudged sentence.

The appellant contends that the military judge erred by denying his motion to suppress a knife found at the place of apprehension and his pretrial statements made while in military police custody, during which time he was not advised of his right to remain silent, and erred further by finding that the appellant did not request counsel on the night of 15–16 December 1989. We disagree.

### I.

#### Facts

On the afternoon of 15 December 1989, the appellant attended a unit Christmas party held at the Noncommissioned Officers' Club on the Edgewood area of Aberdeen Proving Ground, Maryland. The appellant consumed beer at the party and later in the evening when drinking at the club bar with three civilian co-workers. Having run out of money at about 2000 hours, the appellant reached over the bar and, without permission, took a can of beer from a cooler. He then threw a partially empty can of beer at Mr. B, hitting him on the head. When the bartender demanded payment for the beer, the appellant threw his ID card on the bar, stating that he was good for the beer. Mr. E paid for the beer. After this, the appellant came up behind Mr. T and for no apparent reason struck him with a karate chop to the neck, knocking him on his back. When asked by Mr. B why he did that, the appellant kicked Mr. B in the hand causing him to drop his beer. The appellant then spun around and kicked Mr. B in the head causing his glasses to fly off. The appellant and Mr. B then wrestled with each other on the floor. When

1. The appellant was charged with assault with intent to commit murder under Article 134, UCMJ, 10 U.S.C. § 934. He pled guilty to the lesser included offense of assault with a danger-ous weapon under Article 128, UCMJ, upon Specialist (SPC) Lord by stabbing him in the arm and cutting his throat with a knife.

the bartender threatened to call the military police, the appellant ran out the door of the club.

For the next two hours, the appellant wandered about the Edgewood area. The temperature was several degrees below freezing, three or four inches of snow covered the ground, and snow was still falling. Not long after 2200 hours, two military policemen (MPs) patrolling in a vehicle responded to a radio communication advising that an unidentified individual, reportedly involved shortly before in an incident with a taxi driver, may have just been seen by a motorist near the post POL (Petroleum, Oil, Lubricants) point.[2] When the two MPs arrived there moments later, they saw an impression in the snow where a person may have been lying and noticed footprints leading away. Specialist Lord followed the footprints on the run, outdistancing his partner in the process. Following a fence line, SPC Lord saw someone (later identified as the appellant) on the ground. As SPC Lord was reporting his location over his portable radio, the individual sprang up and charged him with knife in hand. This attack carried both individuals to the ground and resulted in knife wounds to SPC Lord's throat, arm, and head. The two and one-half inch wound on SPC Lord's neck was superficial as only the dull side of the blade and the tip of the knife were applied. When the attacker fled, SPC Lord managed to get up from the ground and return to his police sedan. As another military policeman, Sergeant (SGT) Ater, drove up, he saw the appellant cross the road and run to a tree. Shortly thereafter, the appellant was apprehended by SGT Ater and three other military policemen.

The appellant was searched and placed in handirons. The MPs neither gave the appellant a rights warning nor asked any questions. They did ask the appellant for his military ID card, to which the appellant responded, "It's in my inside breast pocket of my jacket." A set of keys were found but no ID card. The appellant then said to SGT Ater, "I could have just killed two of you MPs." No questions were asked of the appellant. He was transported by two MPs to the Edgewood military police station, which was a few minutes away. While in the patrol vehicle, the appellant spat on the floor repeatedly. The two MPs left the appellant in the custody of the desk sergeant and then returned to the scene of the assault to search for the knife.

The small Edgewood military police station where the appellant was held for more than two hours had a typical long, high police desk that one encountered upon entering the station. To the rear of the desk, off the main room, was a small room with a table and chairs. The station had no detention cell or lock-up facility. The appellant was first placed on a small bench against the side wall at one end of, and in front of, the station desk. This bench was approximately eight to ten feet from the front door of the station, which was propped open because the room was extremely warm. A space heater was between the door and the bench and close enough to the appellant to allow him to place his feet upon it. The appellant smelled of drink and appeared to be under the influence of alcohol. When he was brought into the station, the appellant was described as wearing a t-shirt, trousers, and tennis shoes.[3] His hair was wet and matted, and his shirt and shoes also appeared to be wet. Other than evidence that he had been lying in the snow, it is not clear from the record how his shirt became wet, the extent of the wetness, or how long it remained wet in the hot MP station.

According to Sergeant (SGT) Puccio, the MP desk sergeant when the appellant was brought in at about 2300 hours:

> I advised everybody that was in the station at that time not to touch him, not to ask him any questions, not to say anything to him, just to leave him sit there and I got everybody away from him and

2. Though the taxi incident was referred to several times by witnesses and by trial defense counsel, details remain unclear. Neither was the appellant charged with regard to that matter,

nor does the record indicate direct involvement by him.

3. What became of the jacket in his possession at the time of apprehension is not disclosed.

just had them place him on the bench seat in front of the desk, but he became unruly. He was cussing and spitting and he was putting his feet up on the heater. Basically, I just tried to tell him to "at ease" and put his feet down because that heater gets extremely hot and he could burn himself, but he just wouldn't listen and he was cussing and screaming.

While the appellant was seated on the bench, two MPs were working the desk (SGT Puccio and SPC Ambrose) and several others were coming and going, some in anticipation of a shift change at 2300 hours and some on other business. They were either at the opposite end of the MP desk away from the appellant or behind the desk; none were near the appellant. None of the MPs questioned or attempted to question the appellant. Although told repeatedly to be quiet, the appellant continued to talk and make statements. Sergeant Puccio was busy behind the MP desk constantly talking and making telephone calls, directing operations, and preparing for the change of shift. While on the telephone, SGT Puccio overheard the appellant say at one point that, "The MP [apparently referring to the injured SPC Lord] fucked up," and "I should [or "could"] have killed him." No one questioned the appellant about those statements, but SGT Puccio, still on the telephone, indicated by hand gestures to SPC Ambrose that he should write down anything that the appellant said. The appellant's identity was still unknown at this time as he persistently refused to identify himself.

The appellant was told several times by SGT Puccio and by another MP to remove his feet from the heater. He refused each time, responding with profanity to SGT Puccio. On one occasion the appellant said, "No. Fuck you. You people are just trying to keep me cold." The other MP then physically removed the appellant's feet from the heater and placed them on the

floor, telling him once again to keep his feet down.

Not long after the appellant was brought to the station, Staff Sergeant (SSG) Longino, from the Aberdeen MP station, and Corporal (CPL) Molitor arrived with a German shepherd on a leash.[4] Corporal Molitor and the dog went to the far end of the desk when they arrived. The appellant made some comment about "Rin–Tin–Tin," shuffled, stomped or dragged his feet, hissed, and growled at the dog. The dog responded by barking at the appellant. Corporal Molitor took the dog outside to calm the dog, telling the appellant to stop aggravating the dog. Since CPL Molitor was attempting to get instructions from the desk sergeant and checking the map to determine where to take the dog to search for the knife, he came back into the station with the dog. The appellant repeated his barking and hissing at the dog, and the dog started barking again. The dog was again removed and the appellant again warned to stop provoking the dog. When the dog was brought back in, the same thing happened a third time. At no time did the dog approach the appellant. Several MPs testified that the appellant never indicated in any way that he was intimidated by the dog. By the time CPL Molitor and the dog left the MP station sometime after 2300 hours to look for the knife, the appellant had been moved to a back room.

Sergeant Smith relieved SGT Puccio as desk sergeant at the change of shift. He asked the appellant for his name and unit. The appellant replied to the effect that, "I don't have to tell you anything until I get a lawyer and have my rights read." The appellant did not ask specifically for a lawyer.

At approximately 2245 hours, some fifteen minutes after the appellant was brought to the station, but before the shift change, SPC Kraaz arrived dressed in civilian clothing. Having just been assigned to the MP investigation unit as a trainee un-

---

**4.** The dog was used for tracking purposes. As the dog's handler, CPL Molitor had been told to go to the Edgewood area to assist in tracking the suspect involved in the taxi incident. While enroute, the appellant was apprehended and taken to the Edgewood military police station. The handler and dog were required to report to that station when they came on the Edgewood post. With the suspect in custody, the dog's mission was to find the knife.

der military police investigator (MPI) Winner, he was told of the assault incident by SGT Puccio. Investigator Winner was at that moment enroute to the Edgewood station. It was SPC Kraaz's understanding that MPI Winner would either assume responsibility for the case or bring Criminal Investigation Command (CID) agents into the matter. While awaiting MPI Winner's arrival, SPC Kraaz asked the appellant who he was. The appellant responded, "No, I'm not going to give you anything." Specialist Kraaz asked nothing further.

Investigator Winner reached the station at about 2300 hours, during the shift change. Some five minutes later, as soon as he was briefed by the desk sergeant, MPI Winner had the appellant moved from the bench, where he had been for more than 30 minutes, to a chair some distance behind the station desk. Investigator Winner had heard the appellant say he was cold. Anticipating that the investigation would be conducted by the CID, MPI Winner then called the home of CID agent Buttman who advised him that he was about to leave for the Edgewood military police station. Investigator Winner understood that it would be Agent Buttman's responsibility to advise the appellant of his rights. Investigator Winner, who was in civilian clothes, identified himself to the appellant and asked him who he was. The appellant at first provided his social security number and said that should be enough, and that he didn't have to tell MPI Winner who he was. Despite that response, he subsequently told MPI Winner his name, but not his rank. Investigator Winner had the handirons removed and had the appellant walk to the back room. The back room had just been "cleared" on MPI Winner's direction as a place to interview the appellant away from the activity in the main room during the shift change. Investigator Winner had the appellant seated in a chair and told him that a CID agent was enroute who would advise him of his rights and be handling the investigation. Investigator Winner also told the appellant not to say anything, to just sit there, and to be patient. Other than asking his identity, MPI Winner did not question the appellant.

As the appellant was seated in the chair, he said to MPI Winner, "How's the MP? I know I cut him. Is he all right?" Investigator Winner told the appellant that he didn't know and to be quiet. He then left the room leaving SSG Longino and SPC Kraaz to watch the appellant.

Staff Sergeant Longino observed that the appellant, as he sat in the chair, was staring at the floor and seemed to cry from time to time. Without any prior conversation, the appellant suddenly asked SSG Longino where SPC Lord was, how was he, and if he was married. Surprised that the appellant knew the name of the injured MP, SSG Longino responded that he was at the Fallston Hospital, that he didn't have information on his condition, and that he thought he was single. The appellant was quiet for a time, but then said, "I didn't mean to hurt him" and "You don't know the power I felt at that time." Staff Sergeant Longino told him not to say anything more until he was advised of his rights by the investigator. The appellant responded by saying that he knew what his rights were. He was silent for a while but then started talking again, saying that the MPs were not well trained and that they didn't know "what was out there." Staff Sergeant Longino neither responded to the appellant's statements nor asked him any questions, but did tell him a second time not to make any further statements until advised of his rights. Staff Sergeant Longino testified that he did not initiate any of the conversations with the appellant who "would say a little bit, then he would cry, he would spit into his shoe—he had taken his shoes off—he would just cry, bend over, spit in his shoe, and after he'd cry a few moments, then he would just sit up and say different things." The appellant said at one point, "Please don't call my wife," and later asked if the knife had been found.

The knife still had not been found by 2330 hours. Because of the snow cover, the MPs had arranged for delivery of a metal detector to use in the search. Someone near the MP desk shouted that the metal detector had arrived. Though in the back room, the appellant apparently heard

this for after a moment he exclaimed, "You won't find the knife. I threw it over by the tree." Staff Sergeant Longino heard appellant's remark and a short time later went to where a team of MPs were using the grid search method to comb the area from the scene of the assault to the point of apprehension. Staff Sergeant Longino soon found the knife in the snow near the tree where the appellant had been apprehended.

Special Agent Buttman arrived at the MP station and went into the back room to see the suspect. Agent Buttman, also in civilian clothing, identified himself to the appellant and asked him who he was and his rank. The appellant's response was, "Well, what's your rank?" Agent Buttman said that he was a CID agent and that his rank was not a matter of concern to the situation at hand. The appellant replied, "Well, I don't think you need to know my rank." At that, Agent Buttman turned, walked out the door, and had no further contact with the appellant.

At some point when the appellant was in the back room he turned to SPC Kraaz and said, "I stabbed him in the throat, didn't I?" Specialist Kraaz had been sitting there in silence, neither conversing with the appellant, nor asking him any questions.

At about 0100 hours on 16 December, the appellant was transported from the Edgewood military police station to an Army medical facility for a blood test. The appellant's blood-alcohol level at 0200 was approximately .12 percent. Thereafter, the appellant was taken to a detention cell at Aberdeen Proving Ground. His wife went there to see him and leave clothing. During their conversation, at which SSG Longi-

no was present, the appellant said to his wife that he had hurt someone, but that the individual was not married. His wife told him to say nothing more until he had an attorney.

Neither when apprehended, or while in the Edgewood military police station, nor at any other time during the night of 15–16 December, was the appellant given an Article 31(b), UCMJ, 10 U.S.C. § 831(b), warning. There was testimony regarding local policy that required MPs to notify and summon either military police investigators or Criminal Investigation Command personnel whenever they had in custody a suspect who should receive the warning. The investigator would give the warning and conduct any necessary interrogation. It was understood by the MPs that the warning was to be given before questioning, but that both warning and questioning were the responsibility of the investigative personnel.[5]

## II.

### Motion to Suppress

At trial, the defense moved to suppress government introduction of the knife and the six pretrial statements made by the appellant while in custody on the night in question. Considerable testimony was given, briefs presented, and oral argument made before the trial judge. The basis for the motion was appellant's assertion that the circumstances of his custody together with various activities of the MPs, subjected him to the functional equivalent of interrogation which was illegal because he was never advised of his right to remain silent

---

**5.** Although we have some question about the wisdom of a rigid policy concerning rights warnings, in view of our disposition of this case we find it unnecessary to inquire into the propriety or the justification for the policy which was described in testimony as a standing operating procedure. The MPs testified that it was well understood and respected at Aberdeen and Edgewood and that, in general, its purpose was to avoid mistakes in giving the warning by leaving it to those conducting the investigation and taking the statements of witnesses. The testimony reflects without exception that all MPs, those apprehending the appellant and as well as

those in the Edgewood military police station, respected this policy and were remarkably scrupulous in their adherence to it. The appellant was told repeatedly to remain quiet until the investigator arrived, was segregated from the activity of the MP station to the extent practicable under the circumstances, and was not questioned about anything except his identity by anyone throughout the evening. A more timely arrival by the CID agent may have been desirable but the delay was not for any improper reason since, due to the late hour, the agent had to come in from his off-post residence.

or to have counsel. The defense also argued that the appellant did in fact make a request for counsel. The military judge denied the motion to suppress. The military judge found that at no time during the evening in question was the appellant properly warned of his right to remain silent or his right to the presence of an attorney. However, he also found that the statements were spontaneous admissions that were not induced by interrogation and without any inducement that could be characterized as the functional equivalent of interrogation. He rejected the appellant's argument that the MPs "interrogated" the appellant by discussing the case in his presence or by bringing the dog into the station. He found that the discussion of the stabbing by the MPs was a normal part of their duties and that the appellant provoked the dog into barking at him. With regard to the statement made to SGT Smith to the effect that he didn't need to furnish his name or rank until warned of

his rights and provided an attorney, the military judge found that this was in response to a question about the appellant's identity, that he did not ask for a lawyer, and that even if he was asking for a lawyer by this statement, the MPs did not question him about the incident during the rest of the evening.[6]

After denial of the defense motion, the appellant entered a conditional plea of guilty to the charged offenses which allowed him to preserve for appeal his motion to suppress his statements. *See* R.C.M. 910(a)(2); Mil.R.Evid. 304(d)(5).

## III.

### Interrogation

A military accused suspected of committing an offense may not be questioned about that offense without first being informed of his Article 31(b), UCMJ, rights.[7] He must also be advised of his

---

6. The specific statements and their disposition by the military judge are as follows:

 1. "I could [or "would"] have killed two of you MPs," made at the time of apprehension to SGT Ater and others. Although there was no interrogation or other inducement to make the statement, the military judge refused to allow its introduction not on the basis of the defense motion to suppress, but because the inference of other uncharged offenses was not admissible under Manual for Courts–Martial, United States, 1984, Mil.R.Evid. 404(b) [hereinafter Mil. R.Evid.].

 2. "Your MPs fucked up. I could [or "should"] have killed them," made in the presence of SGT Puccio when he was on the telephone at the MP desk. The military judge found that although the appellant complained of being cold, he apparently talked freely without regard to who might have been listening; that the normal activities of an MP station were going on about the appellant and, although there were a number of MPs in the area, none seemed to be paying much attention to the appellant due to the ongoing shift change; that SGT Puccio's concern seemed to be to calm him down on occasion and keep his feet off the hot heater; and that there was no interrogation of the appellant or any action taken by anyone else that could foreseeably induce him to talk.

 3. "How's the MP? I know I cut him. Is he all right?," addressed to MPI Winner when the appellant was seated in the back room. The military judge found that the only questions asked of the appellant up to that point had been as to his identity and that he would have overheard conversations about the injured MP's con-

dition and the ongoing investigation, but that these conversations were neither contrived for the appellant's benefit or directed to him, nor of such a nature as to elicit a response from him.

 4. "I stabbed him [in the throat], didn't I?," made to SPC Kraaz, also in the back room. The military judge found that this statement was made more than two hours after apprehension, but was neither the result of questioning nor reasonably induced by the circumstances; *i.e.,* no functional equivalent of interrogation.

 5. "You don't need a metal detector. [You won't find the knife.] I threw it over by the tree," or words to that effect, stated in SSG Longino's presence in the back room. The military judge found that there was no evidence that the call from the unknown voice that "the metal detector is here" was in any way intended or should have induced the appellant to make a comment about the knife. Furthermore, since the military judge found this statement should not be suppressed, he ruled that the knife was not derivative evidence of an inadmissible statement and was therefore admissible.

 6. "I hurt somebody tonight, but he wasn't married," directed to the appellant's wife at the Aberdeen detention facility in the presence of SSG Longino. The military judge found that the appellant knew that SSG Longino was present and was well aware that he was there to overhear any statement he made.

7. These include: (1) informing the accused or suspect of the nature of the accusation; (2) advising the accused or suspect that he has the right to remain silent; and (3) advising the

right to consult with an attorney, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *United States v. Tempia*, 37 C.M.R. 249 (1967), and if he asks to speak to an attorney while in custody, interrogation must cease until one is made available. Mil.R.Evid. 305(d). Statements elicited in violation of these rules are subject to the exclusionary rule. For purposes of applying Article 31 and the standards of *Miranda–Tempia*, an "interrogation" is defined as a formal or informal questioning in which any incriminating response either is sought or is a reasonable consequence of such questioning. *United States v. Barnes*, 19 M.J. 890 (A.C.M.R.1985), *aff'd*, 22 M.J. 385 (C.M.A.1986); Mil.R.Evid. 305(b)(2).

■ Additionally, conversations or actions designed to elicit an incriminating response from a suspect are the "functional equivalent" of an interrogation. *Barnes*, 19 M.J. at 892; *United States v. McMillan*, 892 F.2d 75 (1989); *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), *rem'd*, 433 A.2d 646 (R.I.1981), *cert. denied*, 456 U.S. 930, 102 S.Ct. 1980, 72 L.Ed.2d 447 (1982) (interrogation under *Miranda* "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.").

Military cases applying this principle include *United States v. Byers*, 26 M.J. 132 (C.M.A.1988) (lecturing a suspect about narcotics and advising him of positive drug urinalysis prior to a rights warning was the functional equivalent of interrogation); *United States v. Kramer*, 30 M.J. 805 (A.F.C.M.R.1990) (investigative technique of lecturing suspect on the weight of evidence against him prior to rights advisement is the "functional equivalent" of interrogation); *United States v. Brabant*, 29 M.J. 259 (C.M.A.1989) (requiring a suspect, who previously had requested counsel during an interrogation, to meet with his commander who admonished him to say nothing was nevertheless the functional equivalent of a "reinitiation of interrogation"); *United States v. Muldoon*, 10 M.J. 254 (C.M.A.1981) (informing a suspect that he had been implicated by someone was the "functional equivalent" of interrogation); *United States v. Dowell*, 10 M.J. 36 (C.M.A.1980), *rev'd on other grounds*, 15 M.J. 351 (C.M.A.1983) (commander's visit of accused in pretrial confinement to inform him of new charges was the "functional equivalent" of interrogation); *United States v. Carter*, 13 M.J. 886 (A.C.M.R. 1982) (commander's visit with accused in pretrial confinement to discuss basis of his confinement was "functional equivalent" of interrogation.) In each of the military cases cited above where the functional equivalent of interrogation was found, someone in authority (commander, investigator) initiated a conversation or discussion (lecture) with an accused.

■ On the other hand, statements which are spontaneous or given freely and voluntarily by a suspect, without any compulsion or action by those in authority, are not considered to be the product of an interrogation and, as such, are not subject to the exclusionary rule. *Barnes*, 19 M.J. at 893 (without encouragement, the accused undertook to engage his first sergeant in conversation about the offense); *Miranda*, 384 U.S. at 478, 86 S.Ct. at 1630; *United States v. Miller*, 7 M.J. 90 (C.M.A. 1979).

## IV.

### No Formal or Informal Interrogation

■ We find that all six statements that were the subject of the appellant's motion to suppress at trial were unsolicited, spontaneous, and voluntary. In reaching this conclusion, we first determine that during appellant's apprehension and subsequent detention throughout the night in question, there was no direct interrogation or questioning of the appellant with regard to the offense of which he was

accused or suspect that any statement made may be used against him in a trial by court-martial. Mil.R.Evid. 305(c). As discussed *in-* *fra*, merely asking a suspect to identify himself does not require an Article 31(b), UCMJ, warning beforehand.

suspected. Other than questions directed to the appellant to establish his identity, there is no evidence of any other questions being put to him by anyone that evening. Just the opposite; the appellant was told repeatedly from the time he entered the MP station to remain silent and to say nothing until the responsible investigator arrived. This was in accordance with standing operating procedure for the MPs, and had to be repeated numerous times because the appellant continued to make comments, ask questions, or engage various individuals in conversation. Of course, the MPs did ask the appellant on several occasions to identify himself.[8] However, attempting to identify a suspect is part of the "booking" process, and while such questions may be considered as "interrogation," they are an exception to *Miranda* and do not have to be preceded by a rights warning; such questions do not require a testimonial response and so do not implicate Fifth Amendment protections. *See Pennsylvania v. Muniz*, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990); *California v. Byers*, 402 U.S. 424, 432, 91 S.Ct. 1535, 1540, 29 L.Ed.2d 9 (1971). Nor do such questions require an Article 31(b), UCMJ, warning. *United States v. Lloyd*, 10 M.J. 172 (C.M.A.1981); *United States v. Leiffer*, 13 M.J. 337 (C.M.A.1982). Accordingly, there was no "interrogation" in the sense that the appellant was being questioned about an offense and an incriminating response was sought or was a reasonable consequence of the questioning. Mil. R.Evid. 305(b)(2).

### V.

### No Functional Equivalent of Interrogation

■ The appellant asserts, nevertheless, that his statements were made while he was subjected to the "functional equivalent" of interrogation at the Edgewood military police station. In support of this theory, he points to the following: that he was placed handcuffed on a bench near an open door; that he was cold and wearing wet clothing; that an MP was directed to write down anything he said; that he was questioned about his name and rank; that a police dog was brought into the room; and that MPs in the room were talking about the attack and related matters.

We find that none of the actions or words of the military police, the MP investigator, or the CID agent taken either individually or cumulatively show any design or attempt, direct or disguised, to elicit incriminating responses which, in view of recent case law, could be characterized as, or which otherwise rise to the level of, the functional equivalent of interrogation. We are mindful of and reaffirm the statement in *Barnes* that this court will not tolerate efforts to finesse safeguards against unlawful interrogation. However, the record in this case evidences no such efforts.

At the outset, we note that, of four incriminating statements made while in the Edgewood military police station, only one was voiced while the appellant was seated on the bench forward of the MP desk; the other three were made later when the appellant was seated in the back room. Shortly after the appellant was brought to the station and placed on the bench, he was heard by SGT Puccio, the desk sergeant, to say, "The MP fucked up. I should (or "could") have killed him." [9]

Placing the appellant on a bench in view of the desk sergeant who was responsible

---

**8.** The apprehending military policemen asked for appellant's ID card, but it was not found in the pocket of his jacket as he indicated. Since the appellant refused to identify himself and his identity was not otherwise known, several military policemen asked over the next hour or so who he was and his rank. At one point he stated his social security number which led to a search in the installation personnel roster in an attempt to identify him by the number. He eventually gave his name, but not his rank, to MPI Winner. Later, Agent Buttman asked him his name and rank. When the appellant refused to give his rank, the agent terminated the interview and left.

**9.** Since the statement was heard by SGT Puccio while he was on duty and he was due to be relieved at 2300 hours when the shift changed, it must have been made sometime between 2230 when the appellant arrived at the station and 2300 hours, or during the first half hour of appellant's detention.

for a suspect of unknown identity, a suspect who was swearing and spitting, and was unruly and uncooperative, was not unreasonable under the circumstances. It appears to have been a matter of practicality. There was no detention cell in the building in which the suspect could be placed. Due to the imminent shift change, MPs were coming and going and milling about the large room on both sides of the MP desk. By placing the appellant in a corner at the end of the MP desk furthest from the routine activities of the station, and by admonishing the MPs to not touch, question, or speak to him and to just let him sit there, SGT Puccio sought to isolate the suspect to the extent practicable until the investigator arrived and still be able to easily observe the appellant from his duty location behind the desk.

A few feet in front of the bench was a small heater which apparently was very hot. The heater was between the appellant and the station door, which was propped open at the time to provide some relief to those working inside from the excessive heat of the room ("upwards of 95 degrees"). Even the open door afforded little relief, for the draft was immediately warmed by the room. Still, the appellant was heard to complain of being cold, but in what manner or degree is not disclosed in the record.[10] That the appellant kept placing his feet on the hot heater despite SGT Puccio's repeated warning to remove them lest he suffer burns indicates that his feet were cold. That would not be unexpected since he may have been outdoors in freezing weather for two hours or more prior to his apprehension and was wearing tennis shoes which were wet.[11]

Next, the appellant argues that directing someone to take down his comments was tantamount to commencing interrogation, even though no one questioned or conversed with the appellant. We find no merit to this suggestion. Despite being told repeatedly by SGT Puccio to remain quiet, the appellant voiced profane and disrespectful language to him and continued to make other comments, apparently to no one in particular. The incriminating statement about killing MPs was one of the comments SGT Puccio overheard while he was busy on the telephone. Rather than interrupt pressing duty activities to pay closer attention to the appellant, he gestured to SPC Ambrose to take a pad and write down what the suspect was saying. This was not unreasonable, for as a trained police officer, SGT Puccio knew that spontaneous statements by a suspect could be used against him. It was done in view of the appellant's refusal to remain silent and the startling words he voiced, rather than as an effort to induce him to make additional statements. Sergeant Puccio's actions were directed to attempting to keep a disruptive suspect quiet and under control; to suggest that he was attempting to encourage the appellant to say more is without any support in the record. In any event, the incriminating statement was made spontaneously before any notes were taken. Anything the appellant said which was written down thereafter neither was used against him nor was made a part of the record. Finally, common sense suggests that the appellant, knowing that an MP was going to record his words, might be more inclined to temper his outbursts rather than be encouraged to speak more freely.

The appellant next suggests that repeated efforts to establish the appellant's identity became coercive. It is axiomatic in police work that a suspect is routinely asked to identify himself. That the appellant may have been asked as many as five

---

**10.** The extent to which the appellant's clothing was damp or wet, and whether this caused him to be cold is not clear. There is no evidence in the record of a request for a jacket or blanket, or for dry clothing, or that the appellant asked for hot coffee, that the door be closed, that he be moved, or any other request that could reasonably be expected from a person in the appellant's situation. Nothing in the record suggests that the MPs denied the appellant assistance or comfort requests. To the contrary, placing him in front of a heater in a room already very warm indicates the opposite; *i.e.,* concern for his condition.

**11.** He removed his shoes later when he was sitting in the back room.

times to identify himself suggests nothing improper in view of his persistent and deliberate refusals to provide his name and rank. The verbal exchanges between the appellant and various MPs as they sought his identity tend to reflect that, rather than being intimidated in any way, the appellant derived some sort of satisfaction from being uncooperative and cleverly deflecting the questions about his identity.

Next, the presence of the police dog cannot by any stretch of the imagination be taken as intimidating the appellant or otherwise inducing him to make an incriminating statement. The dog's handler, CPL Molitor, was in the station to receive instructions and to study a post map before proceeding to the attack site where he intended to use the dog to locate the knife. The handler's testimony opined that the dog would have taken no particular interest in the suspect seated at the far end of the MP desk had the appellant not made a comment and then hissed and growled and stamped or shuffled his feet, actions which invited the dog's attention and provoked it to bark. Corporal Molitor was forced to interrupt his orientation to remove and calm the dog and ask the appellant not to further aggravate the dog. That appellant twice more repeated similar provocations causing the dog to be removed each time and requiring additional warnings that the appellant cease such acts, which he ignored, removes any doubt that the appellant had any fear of the dog. The appellant's conduct delayed the handler's mission, prolonging the dog's presence in the station. Corporal Molitor kept the dog at the far end of the MP desk, never allowing it to be near the appellant. Finally, upon examination of the record, we conclude that the dog was not brought into the station until some time after the appellant already had made the incriminating statement about killing MPs.[12]

Lastly, the appellant argues that conversations and remarks about the attack by various MPs in the station had the effect of inducing the appellant to make incriminating statements. The record does not disclose what was discussed specifically by which MPs, but there are suggestions, and it may be assumed, that there were remarks about the attack, the name of the injured MP, speculation about his condition, and that the appellant was the suspect. Even assuming this, there is nothing in the record to indicate what the appellant may have overheard while he was seated on the bench. More importantly, there is nothing to suggest that any of the comments or conversations were in any way directed to the appellant or made for his benefit. We find no design or intent to encourage the appellant to make incriminating statements. As a matter of law, remarks by police officers about an offense, even in the immediate presence of a suspect, are not considered to be the functional equivalent of interrogation if they were not directed at the suspect or designed to elicit an incriminating statement from him. *See Rhode Island v. Innis*, and *United States v. McMillan*. Nothing here can be construed to such ends.

Thus, we find that the appellant's statement made while on the bench was spontaneous and voluntary, without any encouragement or prompting. Not only do we reject the appellant's assertion that the events in the military police station subjected him to the "functional equivalent" of interrogation, we further find that the appellant was in fact predisposed to make the statement. In this regard, it is instructive to consider the statement made by the appellant moments after he was apprehended: "I could [or "would"] have killed two of you MPs." This was spontaneous and voluntary for the apprehending MPs only

---

12. We have previously concluded that the incriminating statement was made shortly after the appellant was brought to the station at 2230 hours while SGT Puccio was still on duty as desk sergeant. Corporal Molitor testified that, by the time he left the station with the dog to search for the knife, the appellant had been moved to the back room. Investigator Winner was responsible for moving the appellant, but MPI Winner did not arrive at the station until after 2300 hours. It would appear then, that the dog may have been brought into the station shortly before 2300 hours while SGT Puccio was still on duty, but after the appellant's incriminating statement.

asked for his ID card and had said nothing else. The words seem to suggest a boasting or bragging, prompted perhaps by a feeling of euphoria or exhilaration resulting from his physical attack on the MP. This would appear to be supported by appellant's own words later that evening when he said to SSG Longino, "You don't know the power I felt at the time [when he attacked SPC Lord]." However one characterizes his motivation, suffice it to say that the appellant apparently felt an emotional compulsion to speak out flowing from his physical exertions involving the attack and his subsequent flight.

Additionally, human experience suggests that his inebriated state as a cause contributing to the loosening of his tongue cannot be ruled out. We believe this predisposition to vocalize remained substantially unabated during the short ride to the Edgewood station, and once there was not blunted even by SGT Puccio's enjoinders to keep quiet. He continued to exclaim about how the MPs had messed up and how he could have killed them. This statement clearly was in the same vein as the one made minutes before to the apprehending MPs and, we believe, was prompted by the same emotions. Under the circumstances, spontaneity and predisposition to speak are the most convincing explanations for appellant's incriminating statements; they would have been made irrespective of the presence, or absence, of any other inducement or encouragement. We have found no other inducement. For whatever reasons, the appellant felt a need to speak out. His exclamations were spontaneous.[13]

 The three remaining incriminating statements heard at the Edgewood military police station were made while the appellant was in the back room ("How's the MP? I know I cut him. Is he all right?," to MPI Winner; "I stabbed him [in the throat], didn't I?," to SPC Kraaz; and, "You don't need a metal detector [you won't find the knife]. I threw it over by the tree," to whomever was within earshot). In finding that there were no words or actions by the MPs which could be construed as an attempt to elicit these statements and that all three were spontaneous, we note that by moving the appellant to the back room where it was warmer, more isolated from the MP activities, and the handcuffs had been removed, most of those influences asserted as subjecting the appellant to the functional equivalent of interrogation were removed. The appellant even took off his wet shoes, which may have been a source of his complaints about being cold. His question to MPI Winner was an attempt to find out more about the victim's condition. Investigator Winner had told him the CID agent was on his way to the station to conduct the investigation, that he should be quiet, and to just sit there and be patient; but did not otherwise engage him in conversation. The question to SPC Kraaz also was an attempt to obtain information about the victim's injuries; it too was unsolicited and voluntary. His statement about the metal detector and the location of the knife admittedly were prompted by the shout of an unidentified MP from the next room that the metal detector had arrived. There is no suggestion whatever in the record that this exclamation had anything to do with the appellant's presence, and we decline to attach any design or improper motive to it such as could be said to be intended to elicit a response from the appellant.

We also find that the sixth and last incriminating statement made by the appellant to his wife ("I hurt somebody tonight, but he wasn't married.") while at the Aberdeen detention cell was wholly spontaneous and voluntary. It was made because of his wife's presence, seemingly in explanation of his apprehension, not because of actions or words of the MPs. See *Arizona v. Mauro*, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987) (not interrogation when police let the wife of the suspect talk to him and recorded the conversation).

### VI.

### Request for Counsel

 The appellant also contends that the military judge failed to find that

---

**13.** Although his subsequent statements also were spontaneous, their words indicate a change in tone, becoming less boastful and more serious or even remorseful (*e.g.*, asking about the MP's injuries) as he had time to reflect upon what he had done.

he properly exercised his right to request counsel. Sergeant Smith testified that after he relieved SGT Puccio as desk sergeant, he asked the appellant for his name and unit; the appellant's reply was to the effect that, "I don't have to tell you anything [except my social security number] until I get a lawyer and have my rights read." The military judge found that by making this statement in response to the question about his identity, the appellant was not specifically asking for an attorney. We agree. The appellant's statement is nothing more than a reference to his right to have a lawyer, and is a continuation of his sparring with the MPs over disclosing his identity. Accordingly, the strictures of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, *rehearing denied*, 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981), did not come into play. Sergeant Smith testified specifically that the appellant never asked for an attorney. There is no other evidence in the record that appellant asked for counsel or even mentioned an attorney. Assuming, *arguendo*, that the words could be construed as asking for an attorney, it would have made no difference because the appellant was not thereafter interrogated or questioned, except about his identity, and he himself initiated any subsequent conversations. We hold that the military judge did not err.

Accordingly, the assertions of error, to include those raised personally by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), are without merit.

The findings of guilty and the sentence are affirmed.

Judge WERNER and Judge GRAVELLE concur.